United States District Court
Southern District of Texas
**ENTERED**
May 01, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| GOODMAN MANUFACTURING COMPANY, L.P., ET AL., | § § § § |
| Plaintiffs. | § § |
| VS. | §   CIVIL ACTION NO. 4:18-CV-03499 |
| PACIFIC LINK, ET AL., | § § § |
| Defendants. | § |

## **MEMORANDUM AND RECOMMENDATION**

Before me is Defendant Wenzhou Qicheng Distribution Electrical Equipment Co., Ltd.'s Motion to Dismiss; and Incorporated Memorandum of Law ("Motion to Dismiss"). *See* Dkt. 16. In the Motion to Dismiss, Wenzhou Qicheng Distribution Electrical Equipment Co., Ltd. ("Qicheng") argues that, pursuant to Federal Rule of Civil Procedure 12(b)(2), this case should be dismissed for a lack of personal jurisdiction. Having reviewed the parties' briefing on the Motion to Dismiss, analyzed the applicable law, and entertained oral argument, I recommend that the Motion to Dismiss be **DENIED**.

### **BACKGROUND**

Plaintiffs Goodman Manufacturing Company, L.P. and Goodman Company, L.P. (collectively, "Goodman") are in the business of manufacturing and selling air conditioning and heating systems. Goodman's headquarters are located in Houston, Texas. Qicheng, a Chinese limited company with its headquarters in Wenzhou, China, manufactures circuit breakers, disconnect pullouts, and other component parts used in the manufacture and

assembly of air conditioners and air conditioner handlers. Pacific Link Inc. ("Pacific Link"), an Ohio corporation with its principal place of business in Ohio, acts as Qicheng's American distributor.

In 2014, Goodman began looking for a new supplier of disconnect pullouts to incorporate in its air handlers. A disconnect pullout is a safety device that turns the power off when the door to a unit is open, preventing repairmen or technicians from being electrocuted while performing maintenance on the system.

As part of the search for a new supplier, Goodman made contact with Pacific Link. The two companies exchanged information about the possibility of obtaining the disconnect pullouts from Qicheng. Qicheng has an arrangement by which it sells its products to Pacific Link. Pacific Link then re-sells those products to other companies.

In April 2014, Max Philo ("Philo"), a Goodman employee in the Corporate Supplier Quality Division, traveled to China to visit Qicheng's facilities. The purpose of the visit was to ascertain if the Chinese company could provide the disconnect pullouts Goodman needed. Qicheng paid for Philo's hotel room and then invoiced Goodman in Texas for reimbursement. During his visit to China, Philo prepared a detailed Supplier Site Assessment Checklist to determine whether Qicheng's manufacturing facilities met Goodman's manufacturing design and safety protocols.

After Philo returned to Houston, he shared the Supplier Site Assessment Checklist with Qicheng by email. Philo's email signature identifies his Goodman work address in Houston, Texas, demonstrating beyond a shadow of a doubt that Qicheng was aware that Goodman called Houston, Texas its home. The email explained that although "[t]he

general impression was positive," Goodman needed Qicheng to make some improvements to its processes and formulate a plan to address certain concerns. Dkt. 22-7 at 2. In putting together the requested plan, Qicheng provided numerous documents—including an updated Design Failure Mode and Effects Analysis, component part drawing, and a fishbone analysis (that is, an analysis that identifies possible causes for a problem)—that were ultimately forwarded to Goodman. As part of the exchange of information required to become a Goodman supplier, Goodman sent a design drawing to Qicheng to use in manufacturing the disconnect pullouts at issue in this lawsuit. That highly technical drawing specifically referenced Qicheng and made it clear that the disconnect pullouts were being manufactured for "The Goodman Family of Companies." Dkt. 22-10 at 2.

After receiving assurances that Qicheng could meet certain quality standards, Goodman placed an order for approximately 200,000 disconnect pullouts through Pacific Link, with the understanding that Qicheng would be producing the goods at their Chinese facility for ultimate delivery to Goodman in Texas. Goodman received the disconnect pullouts and incorporated them into its air handler units. Goodman claims that the disconnect pullouts were defective, leading to a nationwide recall. In September 2018, Goodman filed this lawsuit against Qicheng and Pacific Link, bringing causes of action for breach of contract, breach of warranty, negligence, and products liability. Qicheng seeks to dismiss Goodman's claims against it for lack of personal jurisdiction.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of an action when a court lacks personal jurisdiction over the defendant. "When a nonresident defendant

3

challenges personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the defendant." *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999). In deciding whether the plaintiff has met that burden at this early stage in the case, "the court must accept as true all uncontroverted allegations in the complaint and must resolve any factual disputes in favor of the plaintiff." *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012). To determine whether personal jurisdiction exists over a defendant, the district court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). When a district court rules on a Rule 12(b)(2) motion without an evidentiary hearing, as is the case here, the plaintiff may establish personal jurisdiction by presenting a *prima facie* case that personal jurisdiction is proper. *See Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). After a plaintiff makes his *prima facie* case, the burden then shifts to the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985).

"A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). Because "the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry reduces to only the federal due process analysis." *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522,

4

539 (5th Cir. 2019). "To comport with due process demands, a plaintiff in a diversity case must establish that the non-resident defendant 'purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state' and that 'the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.'" *Zoch v. Magna Seating (Germany) GmbH*, ___ F. App'x ___, 2020 WL 1951482, at *3 (5th Cir. Apr. 22, 2020) (quoting *Halliburton*, 921 F.3d at 530) (brackets omitted).

The United States Supreme Court has recognized two kinds of personal jurisdiction: general jurisdiction and specific jurisdiction. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779–80 (2017). General jurisdiction exists over a non-resident defendant when its "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The specific-jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (internal quotation marks and citation omitted). For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 564 U.S. at 919 (internal quotation marks and citation omitted). Specific jurisdiction is proper when the plaintiff alleges a cause of action that grows out of or relates to a contact between the defendant and the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). The Fifth Circuit uses a three-step analysis for specific jurisdiction:

> (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Ward v. Rhode*, 544 F. App'x, 349, 352 (5th Cir. 2013) (citation omitted). "Specific jurisdiction should be determined on a case-by-case basis under the facts of each individual case." *Zoch,* 2020 WL 1951482, at *8.

"In cases involving a product sold or manufactured by a foreign defendant," the Fifth Circuit utilizes "a stream-of-commerce approach to personal jurisdiction, under which the minimum contacts requirement is met so long as the court finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state." *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (internal quotation marks and citation omitted). The Fifth Circuit reaffirmed the validity of the stream-of-commerce test as recently as last week. *See Zoch,* 2020 WL 1951482, at *5.[1] Under this test, "mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of

---

[1] The Supreme Court's most recent foray into the stream-of-commerce jurisdictional inquiry took place in 2011 in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). Many hoped that the *Nicastro* Court would help illuminate the somewhat confusing state of the stream-of-commerce jurisdictional theory created by a sharply divided Court in *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987). Alas, *Nicastro* did not help clarify the situation, as there were three separate opinions with no position commanding a majority. Important to the present case before me, the Fifth Circuit has expressly held that *Nicastro* did not upset the long-standing stream-of-commerce jurisprudence found in this circuit. *See Zoch*, 2020 WL 1951482, at *5; *Ainsworth*, 716 F.3d at 178.

commerce, but the defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Ainsworth*, 716 F.3d at 177 (quotation marks, brackets, footnote, and citation omitted). "Ultimately, foreseeability in the stream-of-commerce context can be proven in one of two ways, (1) either the quantity of defendant's actual or attempted sales (advertising or marketing) is high enough that the defendant can reasonably anticipate being haled into the forum state or (2) the defendant has specific knowledge or expectation that its specific injury-causing product is being sold in the forum state." *Boat Serv. of Galveston, Inc. v. NRE Power Sys., Inc.*, ___ F. Supp. 3d ___, 2019 WL 6716907, at *4 (E.D. La. Dec. 10, 2019). This case focuses on the second prong.

## ANALYSIS

The ultimate jurisdictional determination in this case hinges on a relatively simple, straightforward question: Did Qicheng have specific knowledge or an expectation that the disconnect pullouts it manufactured would end up in the State of Texas? If the answer to that question is yes, then personal jurisdiction is proper in the Lone Star State under a stream-of-commerce theory and this case should proceed with discovery. *See id.* at *6 ("[A]ctual knowledge or expectation of delivery to the forum state is a sufficient basis for personal jurisdiction."). If, on the other hand, Qicheng did not have actual knowledge or an expectation that its disconnect pullouts were destined for the State of Texas, jurisdiction does not attach and Qicheng should be dismissed from this lawsuit.

To be perfectly clear, "[p]ersonal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign analysis," and evidence of national sales will not, without more,

7

support specific jurisdiction in any state, much less Texas. *Nicastro*, 564 U.S. at 884. *See also Asahi Metal*, 480 U.S. at 112 ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."). Allegations that Qicheng directed its activities at the United States generally are thus insufficient to establish that Qicheng acted intentionally with an express aim at the State of Texas such that Qicheng is subject to specific personal jurisdiction in Texas. *See Nicastro*, 564 U.S. at 885–86 (finding no personal jurisdiction in New Jersey where the defendant had "directed marketing and sales efforts at the United States," but plaintiff had "not established that [defendant] engaged in conduct purposefully directed at New Jersey"). If all Qicheng did was sell the disconnect pullouts to its United States distributor, Pacific Link, without any inkling whatsoever that the product would eventually end up in Texas, specific jurisdiction would be lacking in this case. But that is not what happened here. Far from it.

There is no question that Qicheng had a reasonable belief that the 200,000 disconnect pullouts at issue in this case, which were manufactured at its Chinese facility, would end up with Goodman in Houston, Texas. As detailed above, Goodman undertook a great deal of due diligence before selecting a company to manufacture the needed disconnect pullouts. To begin, Goodman sent a representative to China to tour the Qicheng factory and evaluate its capability to produce a large quantity of disconnect pullouts. After that visit, Goodman reached out to Qicheng—both directly by email to Qicheng executives and indirectly through Pacific Link—to exchange information so that Goodman could make an educated decision as to whether it felt confident having Qicheng mass produce

8

the disconnect pullouts. Before placing an order, Goodman identified specific areas in which Qicheng would have to improve, telling the Chinese company that "approval will be dependent upon successful completion of those items noted in the assessment checklist attached. . . . Once each item has been completed please provide evidence of each via documentation or pictures as verification of completion. Once these items are completed a final assessment score will be provided along with approval once a score of 3.0 has been met." Dkt. 22-7 at 3. Goodman also provided Qicheng design drawings with detailed specifications so that the Chinese manufacturer would know exactly what to produce. And those drawings prominently displayed the Goodman name, making it blatantly obvious to everyone and anyone that the disconnect pullouts were destined for Goodman. This is not a situation in which Goodman contacted Pacific Link out of the blue and ordered a product without knowing the identity of the company that would be manufacturing the item. Goodman fully expected when it placed an order with Pacific Link that Qicheng would be the company manufacturing the 200,000 disconnect pullouts. As Goodman correctly observes: "Qicheng's disconnect pullouts did not just *end up* in Texas through the stream of commerce—there was a purposeful relationship with Goodman . . . that facilitated Qicheng's products being provided to Goodman and incorporated into Goodman's air handlers for sale principally in Texas but also across the country." Dkt. 22 at 15. To his credit, Qicheng's counsel readily acknowledged at oral argument that Qicheng understood that the disconnect pullouts it produced were likely to be delivered to Goodman at its headquarters in Texas.

9

In truth, that is where the inquiry starts and ends. The Fifth Circuit has "consistently held that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'" *Luv N' Care*, 438 F.3d at 470 (quoting *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993)). "Where a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state." *Id*. *See also Ruston*, 9 F.3d at 419 ("[A] defendant's placing of its product in the stream of commerce with the knowledge that the product will be used in the forum state is enough to constitute minimum contacts.").

There is a long list of cases in the Fifth Circuit, both at the appellate and district level, holding that specific jurisdiction over a foreign manufacturer exists when the non-resident defendant has specific knowledge or expectation that its product is being sold in the forum state. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 548 (5th Cir. 2014) (finding jurisdiction over a foreign manufacturer in Louisiana because the stream-of-commerce foreseeability standard is more than satisfied when "there is evidence showing that [defendant] absolutely knew that the drywall was going to New Orleans") (quotation marks omitted); *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 380 (5th Cir. 2002) (finding jurisdiction over an Italian defendant existed in Louisiana in part because "[a]s a voluntary member of the economic chain that brought [the product] to Louisiana, [the defendant] has purposely availed itself of the privilege of conducting business in that state"); *Ruston*, 9 F.3d at 420 (finding personal jurisdiction

where the "[defendant] not only *could have foreseen* that the products might end up in Texas, it *knew* as a fact that the products were going to be delivered to a specific user in Houston, Texas"); *Boat Serv. of Galveston,* 2019 WL 6716907, at *5 ("[T]he Court finds that it possesses personal jurisdiction over [defendant] based on [defendant's] actual knowledge and expectation that its allegedly malfunctioning [products] were being delivered to Louisiana."); *Zoch v. Daimler*, *AG*, No. 6:16-CV-00057-RWS, 2017 WL 2903264, at *9 (E.D. Tex. May 16, 2017) ("[T]he pertinent inquiry is not what knowledge [the defendant] had regarding distribution of the [product] to the United States, but whether it had knowledge or awareness that the [product] it manufactured would end up in *Texas*."). There is no reason the result here should be any different. Qicheng had both knowledge and awareness that the disconnect pullouts it manufactured would end up with Goodman in Texas. That being the case, the constitutional touchstone of due process has been easily satisfied.[2]

Once I determine that the minimum contacts requirement has been met, I must satisfy myself that there is a nexus between Qicheng's contacts with the State of Texas and Goodman's claims in this lawsuit. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 591 (5th Cir. 2014) ("While the first prong of the personal jurisdiction

---

[2] Qicheng correctly points out that "jurisdiction cannot be premised on the unilateral conduct of [Goodman] or of a third party, such as Pacific Link who re-sold Qicheng products to Goodman." Dkt. 25 at 5 (citing *Walden,* 571 U.S. at 284 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third party) and the forum state.")). In finding jurisdiction proper in this case, I need not look at any contacts between Pacific Link and the State of Texas, or Goodman and the State of Texas. All I need to do is focus entirely on Qicheng's placement of the disconnect pullouts in the stream of commerce knowing full well that the goods were headed to Goodman in Texas.

test assesses the connection between the defendant and the forum, the second prong looks at the relationship between the defendant's forum contacts and the plaintiffs' claims."). That is easy. The thrust of this lawsuit is that Qicheng manufactured defective disconnect pullouts. All the causes of action asserted in this case—breach of contract, breach of warranty, negligence, and products liability—relate directly to Qicheng's manufacture and supply of the disconnect pullouts to Goodman in Texas.

Once Goodman has shown that minimum contacts exist and that the causes of action arise out of those contacts, as it has done here, the burden shifts to Qicheng to show that the exercise of jurisdiction would be unreasonable. *See Luv N' Care*, 438 F.3d at 473. Once a district court finds the existence of minimum contacts purposefully aimed at the forum state, "only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice." *Guyton v. Pronav Ship Mgmt., Inc.*, 139 F. Supp. 2d 815, 820 (S.D. Tex. 2001) (quotation marks, brackets, and citation omitted). "Indeed, once minimum contacts are established, a defendant must present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King*, 471 U.S. at 477). In conducting the fairness inquiry, the Fifth Circuit requires me to examine: "(1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies." *Nuovo Pignone,* 310 F.3d at 382.

Qicheng has failed to present any evidence—much less compelling evidence—that the exercise of personal jurisdiction would be unreasonable or unfair in this case.

12

Importantly, there is no suggestion that litigating in Texas would impose any sort of burden on Qicheng. Goodman is headquartered in Texas, and this state naturally has a strong interest in providing effective means of redress for those business entities that operate within its borders. Moreover, this Court can efficiently and quickly resolve the current controversy, providing a benefit to all parties to the case. All told, there is simply nothing unusual, untoward, or unreasonable about the litigation proceeding here in Texas. Based on the record before me, requiring Qicheng to defend this lawsuit in Texas satisfies "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

To summarize, I have now performed the specific personal jurisdiction analysis required by the Fifth Circuit. Looking at the allegations in the Complaint, as well as the declarations and other documentary evidence submitted in connection with the Motion to Dismiss, I conclude that Qicheng has "purposely avail[ed] itself of the privilege of conducting activities" in Texas, "thus invoking the benefits and protections of [Texas's] laws." *Nicastro*, 564 U.S. at 880 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Therefore, specific jurisdiction over Qicheng exists.

## CONCLUSION

For the reasons identified above, I **RECOMMEND** that the Motion to Dismiss be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to

file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

    SIGNED in Houston, Texas, this 1st day of May, 2020.

                                         ANDREW M. EDISON
                              UNITED STATES MAGISTRATE JUDGE